IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RONALD MAURICE SMITH,<br>**Defendant.** | CRIMINAL NO. <u>CCB-19-0599</u> |

### GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America, by and through Jonathan F. Lenzner, Acting United States Attorney for the District of Maryland, and Joyce K. McDonald, Assistant United States Attorney, and files this Sentencing Memorandum for the use of the Court in determining the sentence "sufficient, but not greater than necessary" to comply with congressionally mandated sentencing considerations. 18 U.S.C. § 3553(a).

### Background

Ronald Smith (hereafter "the Defendant") is 47 years old. He is a former supervisor with the Baltimore City Department of Public Works. He appears before the Court for sentencing based upon his guilty plea to Count 5 of the Superseding Indictment and his admission of a course of conduct that involved cheating DPW, sometimes with and sometimes without, the help of Philip Loverde. The Defendant has admitted that he received $64,000 in payments for "side jobs" in which he performed work using DPW equipment, materials, and personnel to complete private projects which Baltimore City required developers/owners to hire private, approved utilities contractors to perform. Those projects involved connecting new buildings or renovated buildings to the Baltimore City water or sewer system and occurred during the time period 2014

1

- 2015.[1]  The Defendant admitted that $64,000 was the amount of funds he had received for those side jobs and agreed that it was forfeitable to the United States.  Pursuant to the restitution statute, the Defendant should owe mandatory restitution for the monetary loss caused to Baltimore City by his offense conduct. 18 U.S.C. § 3663A(c)(1); ECF 23, ¶¶ 96-97.  However, pursuant to 18 U.S.C. § 3663A(c)(3)(B), the government is not seeking a restitution order for reasons which will be described below.  Therefore, the forfeiture order will be the only monetary penalty in this case unless the Court imposes a fine.  The government recommends against a fine due to the financial circumstances of the Defendant.

**Losses of the City of Baltimore**

As stipulated in the Statement of Facts, the Defendant used DPW equipment, crews, and material to install new or upgraded service for developers/property owners.  The Defendant knew that Baltimore City required those developers/property owners to use private, approved utilities contractors to perform this work.  The Defendant could obtain a secret contract, frequently called a "side job" in Baltimore City slang, because the Defendant charged significantly less than private, City-approved contractors.  Because the Defendant needed to conceal the "side jobs" from DPW officials, he did not obtain work permits for either the work itself or for the necessary street cuts to access the water main and perform the work, and the work was not inspected.  ECF 23 at ¶ 12, 13, 18, 19 and 20.  The Defendant's abuse of his position of trust enabled him to cause other employees to commit his offenses for him.  A frequent co-conspirator, also a DPW employee, directed the crews who performed the work.

---

[1] The Defendant was originally discovered accepting cash payments or checks deposited to his personal bank account for off-the-books work occurring in 2015.  The investigation included a court-ordered wiretap which covered the time period 9/15/2015 – 1/16/2016.  The Quarry Street property water/sewer jobs occurred first in time (in late 2014) of the charged conduct but were identified last by the investigation.

Although the Defendant's pattern of fraudulent conduct caused real harm to the City, attaching a precise dollar figure to the harm is difficult. For example, the City

1. lost the fees which would have been charged to the private utilities contractor for permitting and inspection;

2. incurred the costs for wages of crews who worked on Smith's side jobs, including overtime payments to some workers,

3. lost the materials used by the Defendant for side jobs, including pipes, valves, and asphalt for street repair,

4. incurred the costs for repairing mistakes made on Defendant's side jobs, *e.g.*, the collapsed North Gay Street repair, *Id*. at ¶ 18; and

5. lost the integrity of its utilities mapping system and its water service complaint system.

While the harms described in 1-4 are enumerated in the plea agreement, the harm to the City's utilities mapping system and complaint system have not been stipulated by the Defendant. The government will request a stipulation to the harm caused the utilities mapping system to the City, and if the Defendant does not agree, plans to call the supervisor from the DPW's Office of Asset Management which oversees the City's Utility Viewer program, which produces the maps of the system.

In the ordinary course of the City's business, a contractor's or property owner's application for approval of work permits and inspections informs the City's DPW that new connections or upgraded connections are being made to its water and waste-water systems. After the work is completed by a bonded, approved utilities contractor, the work is inspected by the City, and the development plans are updated with "as built" corrections. (In the construction industry, the intended plan is not always followed because of actual obstructions or other unforeseen issues.) The "as built" drawings are submitted to DPW's Office of Asset Management and are used to update the City's maps of its underground utilities.

An example of the current map of North Gay Street is attached as Ex. 1.  Numbers 1234 - 1250 North Gay Street, which the Defendant stipulated that he and others working at his direction had connected to the City's water main, ECF 23, ¶ 18, are shown on the utilities map as unconnected to the water main.  In addition, the Defendant caused a new 4" water line for a fire sprinkler system to be connected to 1759 East Preston Street because that address was to be used as a commercial property; the location of that new water line is not shown on the East Preston Street utilities map. Ex. 2.  Utilities maps are regularly consulted by City workers in the course of their jobs and are available to contractors and property owners on request.

The Defendant was aware of the usefulness of the City's Utility Viewer program because he used it himself.  As a DPW employee, he accessed or caused others to access on his behalf, the utility maps in the course of both his actual and his clandestine work.  The Defendant was captured on the court-authorized wire-tap of his personal telephone asking a confederate and DPW employee to access the Utility Viewer program.  In call 02396, on October 17, 2015, between the Defendant and another DPW superintendent who assisted the Defendant on his "side jobs," the following exchange occurred (RS is Ron Smith and LP is the DPW superintendent):

> RS: I need you to look up 1301 North Broadway and let me know where the main is?
>
> LP: Well okay, well I can't you say 1301?
>
> RS: Yeah, I think that's Broadway and Preston if I ain't mistaking.
>
> LP: No that ain't Broadway um Preston, that's 15 and 1600 block. That's going to be like Broadway and down near Central a couple block down from Broadway.
>
> RS: Aright when you get a chance just look it up and I need to know the size of the main and where it lay so I can give him a price on this job.
>
> LP: Text me the address and then like when I get back in the house you know and I know that will be the first thing I do.
>
> RS: Aright
>
> LP: Aright

Ex. 3.  The "look up" to which the Defendant is referring is a use of the Utility Viewer system so he can provide a quote for a side job.  The following day, L.P. called the Defendant, and the following exchange occurred:

> RS: What's up man?
>
> LP: Man, it's goin' be a six inch main laying in the gutter!
>
> RS: Ok.  It is at Preston St, ain't it
>
> LP: Huh
>
> RS: It's is at Preston, ain't it?
>
> LP: It's at Preston?  Yea!
>
> RS: Ok.  Yea, I'll call them Monday and see what they goin' do.
>
> LP: Aight.  You ain't have ta work da night
>
> RS: I'm at work now
>
> LP: Oh, oh.  Aight man

Ex. 4.

The Defendant not only failed to conduct his "side jobs" in a way that would update the Utility Viewer maps, he also manipulated the City's system that recorded resident's complaints and work to be performed.  On October 20, 2015, this exchange occurred between R.S. and a confederate, J.H., regarding what to have "Pumpkin" (another confederate and DPW employee) enter into the City computer system that the Defendant knew how to maneuver:

> RS: But um, what you do yo, just have Pumpkin put the, put the address back in the system as a leak on the Riser.[2]
> KH: Right.
> RS: And then, I-I-I'll take care of it from there.
> KH: Aight.
> RS: Aight.
> KH: But I'm just, how soon can you do it? Cause they saying they got inspection coming up.

---

[2] A "riser" is generally a vertical section of pipe conveying water from a lower to a higher level.

5

> RS: Right, but that don't, that don't even affect on inspection. That's what I'm saying.
> KH: Okay.
> RS: That don't have nothing to do with the inspection, yo. Aight? But just, just, just tell Pumpkin put it in the system.
> KH: Alright.
> RS: And and then I'll I'll maneuver it to get it done like that. I don't want to put my name on it just yet because I'm telling you I'm, they, they trying to watch me on some other shit.
> KH: I feel you. I feel you.
> RS: Just-just have to say put it in the system as a leak on the riser. That's all they got to do.
> KH: Okay.
> RS: Aright?
> KH: Aright.
> RS: And I guess from that point I'll take care of it.
> KH: Alright well I might try get him to get Webb and them to go down there or something.
> RS: Even if-if you do that that's cool too but if you put it in the system, I know how to maneuver it.
> KH: Okay, I'm a tell him put in the system today.
> RS: Aight.

Ex. 5.

Although the Defendant's various manipulations of DPW's and the City's legitimate mapping and tracking systems for his personal benefit do not readily equate to a dollar value, the manipulations created a harm to the City which the government asks the Court to consider in sentencing the Defendant. And besides the misuse of DPW resources, the Defendant also set a terrible example for DPW employees with whom he worked or whom he supervised.  As is obvious from the number of corrupt employees who aided the Defendant or who touched his "side" projects, the Defendant's disloyalty undermined DPW at every turn.

The Defendant's motivation was financial.  On October 21, 2015, the Defendant raised with the mortgage broker the possibility of counting income from his "plumbing business" on his mortgage loan application.  Ex. 6 at p. 3.  The mortgage broker stated that the "plumbing" income could only be counted if the Defendant reported it on his taxes.  The Defendant

immediately stated, "I just really started that [business] this year." *Id.*

> Smith:  Now here's my next question before we even, that way I don't have to call you back.  With my, with, with the plumbing, my plumbing work what is it that you need from that.
>
> Sam:  Well, that, that, the only way we can count the plumbing work is if you report it on your taxes.  So if you are not putting it on your taxes .........
>
> Smith:  Right, I, I, I , I real , I, I, I just, I just  really started that this year.
>
> Sam:  Oh, okay, so yeah we can't count that for qualifying but so but what, what we, what we can so we basically be using your job.  But remember I was qualifying you on your base and not on your overtime so.
>
> Smith:  Right
>
> Sam:  Send your stuff in, but yeah the plumbing is just extra for you but we can't ......
>
> Smith:  Okay, All right
>
> Sam:   But going forward you may want, you know to, you may want to consider putting it on your tax return so that.
>
> Smith:  Sure
>
> Sam:   Down the road you know it maybe
>
> Smith:  Right, definitely, okay, alright I'll get all that taken care and submitted to you.
>
> Sam: You're a[we]some and I'll get back to you about that question
>
> Sam:   All righty, thank you
>
> Sam: Good by Mr. Smith, bye bye
>
> Smith:  Alright

Ex. 6.  The Defendant referred to his "side jobs" as his "plumbing business."  "Plumbing business" is just the Defendant's euphemism for his illegal conduct.  The Defendant admitted that he was not a licensed plumber, ECF 23, ¶ 8, he was not an approved utilities contractor with Baltimore City, and he had no legitimate plumbing business.

7

On October 22, 2015, Phil Loverde, an admitted co-conspirator, pointed out that on the TRF project, "checks will roll in every week."  Ex. 7.  Loverde and Smith laughed at "Josh," a TRF employee who doesn't know how to pad his bills and "make a few dollars."  Smith stated: "Really, you don't know how to do nothing?"  And Smith discussed the installation of the fire line and commented that he needed to "see the print" [the utilities viewer] and see the size of the [water] main that he will have to tap into for the fire line—another example of the Defendant's knowledge and use of the map data base which he failed to keep current.  Ex. 7.  The telephone call demonstrates the Defendant's disloyalty to Baltimore City and DPW and his disdain for those who don't know how to defraud their employers.

**Section 3553(a) Factors**

Congress has directed the Court to consider "(1)  the nature and circumstances of the offense and the history and characteristics of the Defendant" [and] "(2)  the need for the sentence imposed --

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the Defendant;
> (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. 3553(a).  Congress has also directed the Court to consider the kinds of sentences available and the sentencing range established for the Defendant under the guidelines and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  18 U.S.C. § 3553(a)(4) and (6).

In the instant case, the Defendant has stipulated to a guideline range of Level 19, which combined with his criminal history of Category I, results in a sentencing range of 30- 37 months.

ECF 20, ¶ 6; ECF 23, ¶ 36, ¶ 86.  The government and the Defendant reserved the right to advocate for a "reasonable sentence."

The Defendant's position was not only an employee within DPW but also a supervisor. The Defendant's violations of his duties as a public servant were extreme.  He not only abandoned his own responsibilities to DPW, but he caused other DPW personnel to commit his offenses for him, and he reaped the benefits.  These offenses committed by a supervisor require a punishment which will deter other DPW supervisors from similar conduct.  The Defendant had worked for DPW for many years and was well known within the agency.  The worksite for a DPW supervisor and employee is not an office, or even the yard to which they report, but is the entire City.  DPW needs employees and supervisors who are not trying to "game" the system but are focused on performing their work.  The Defendant was inserting, or causing false information, to be inserted into DPW systems, and he was using their Maps utility without ever correcting the maps as he performed his side jobs. He completely undercut the entire DPW computer system.

The Defendant typically sticks to whatever unlikely story he first advances; his usual position is the "that's my story, and I'm sticking to it" position.  For example, the Defendant claimed that the repair of the street collapse on North Gay Street as a result of his "side job", is City work because the City has to repair caved in streets.  Another example is Defendant's insistence that when he has been over the permissible alcohol limit on his ignition interlock system, it was a result of excessive use of hand sanitizer.  The Defendant has an alcohol abuse problem for which he has been treated. When he has suffered relapses, as revealed by his ignition interlock failures, he could just admit the lapse and promise to do better.  The Defendant, instead, always chooses to deny the misconduct and stick to his lie. A person who repeatedly claims that

excessive hand sanitizer use is causing interlock system failures is not credible. If the interlock system gave a person a couple of false positives, any reasonable person would adjust their use of hand sanitizer to avoid the problem. On the other hand, a problem drinker would repeatedly trigger the interlock system but blame hand sanitizer. This is precisely the pattern the Defendant showed in the Pre-Trial Services Report of Violations dated January 28, 2021.

If the Defendant were to receive a guideline sentence, he would be in a position to improve his plumbing and construction skills while incarcerated, receive additional substance abuse treatment, and receive counseling to deter him from future misconduct. If he intends to continue in building trades, like many unsupervised or lightly supervised contractors, he is in a position to cheat. And a guideline sentence will deter the Defendant's impulse to cheat to enhance the financial benefit to himself. Moreover, a guideline sentence will be widely known within DPW—an agency which has had repeated issues with the honesty of employees.

For the foregoing reasons, the government requests that the Court impose a guideline sentence on the Defendant, both to deter him personally and to deter other DPW employees from similar breaches of trust.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

By:     ___/s/_____
Joyce K. McDonald
Assistant United States Attorney

CERTIFICATE OF SERVICE

    The foregoing Government's Sentencing Memorandum was served on counsel of record through filing in the Court's electronic filing system.

                                                                                       _____/s/_____
                                                                                       Joyce K. McDonald